**In re S1 CORPORATION SECURITIES LITIGATION**

**No. CIV. A. 1:00CV1156BBM.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 23, 2001.

1338

Martin D. Chitwood, Alan R. Perry, Jr., Chitwood & Harley, Atlanta, GA, for Deljou Family, Richard Allegood, Snodgrass Foundation, Raveesh Kumra, James E. Rice, Jr.

Michael J. Bowers, Thomas Joshua Archer, Meadows, Ichter & Trigg, Atlanta, GA, for Chitwood & Harley.

Everette L. Doffermyre, Jr., Doffermyre, Shields, Canfield, Knowles & Devine, Atlanta, GA, Martin D. Chitwood, Neal S. Berinhout, Christis A. Cannon, Chitwood & Harley, Atlanta, GA, Kenneth J. Vianale, Maya Saxena, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, for Amy Zimmerman, Bruce McCall, Carol Nahon, Robert L. Block, William H. Burnstein, M.D., Michael Bauminger, John M. Zenner, Dieter Felgen Stanley Weindorf, Tommmy E. Warner, Sr., NicoleFelgen, Randy L. Smith, Peter D. Kadyk, Devinder Ahuja.

## ORDER

MARTIN, District Judge.

This securities class action is currently before the court on the plaintiffs' motions to exceed page limitations [Doc. Nos. 44–1, 54–1] and motion for leave to file a surreply brief in opposition to defendant Michel Akkermans' reply in support of his motion to dismiss the consolidated complaint [Doc. No. 59–1], motions to exceed page limitations filed by defendants S1 Corporation, James S. Mahan III, and Robert F. Stockwell [Doc. Nos. 42–1, 52–1], motion to dismiss the consolidated complaint filed by defendants S1 Corporation, James S. Mahan III, and Robert F. Stockwell [Doc. No. 43–1], motions to exceed page limitations filed by defendant Michel Akkermans [Doc. Nos. 47–1, 57–1], and motion to dismiss the consolidated complaint filed by defendant Michel Akkermans [Doc. No. 48–1].

### Factual and Procedural Background

S1 Corporation ("S1") is a provider of internet-based financial services headquartered in Atlanta, Georgia.[1] S1 develops internet applications that enable companies offering financial services to create their own financial portals on the internet. In order to stay competitive within a highly competitive industry, S1 undertook a campaign in 1999 and 2000 to acquire numerous companies to further its expressed goal of growth through the pursuit of strategic acquisitions. On May 17, 1999, S1 (then known as "Security First Technologies") announced publicly that it would acquire FICS Group N.V. ("FICS"), a privately held company based in Belgium, and Edify Corporation ("Edify"), a publicly traded company based in Santa Clara, California, for approximately $1.3 billion in stock. Under the terms of the FICS/Edify acquisition, defendant Michel Akkermans ("Akkermans"), the Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Chairman") of FICS, became Chairman of the newly combined company. Defendant James S.

---

1. Much of the underlying facts are taken from the consolidated complaint.

Mahan III ("Mahan"), CEO of Security First Technologies, was to continue as the new company's CEO. Robert Stockwell ("Stockwell") became the company's Chief Financial Officer. The FICS/Edify acquisition was announced as a significant event for the company, which changed its name to "S1 Corporation." Certain details, including risks associated with the FICS/Edify acquisition was disclosed by S1 in its Securities Exchange Commission ("SEC") form 8K statement on May 21, 1999,[2] and in its SEC form S–4 and amended form S–4/A for shareholder approval on July 13, 1999 and October 12, 1999 respectively.[3]

A few months later on September 2, 1999, S1 announced a deal to acquire privately-held VerticalOne Corporation, an Atlanta based internet services provider, for 3.86 million shares of S1 common stock, valued at approximately $160 million. That same month on September 22, 1999, S1 issued a press release touting the

2. The 8K form states the following in part:

As we look beyond 1999, we will be moving the company away from the traditional software revenue model of up front license fees and ongoing maintenance fees, towards a recurring revenue model that has driven S1's growth to date.

Central to establishing recurring revenues will be our ability to host many of our new product offerings in S1's data center. Also, we anticipate that we will establish recurring revenue streams from those customers who choose to run our products themselves based on per customer per month fees on direct licenses.

. . . .

During the transition period to a deferred revenue stream, we anticipate that growth in revenues will moderate in the year 2000. Form 8K, May 21, 1999. The revenue recognition policies of Security First and FICS/Edify were different in that FICS/Edify depended more on one-time sales of software packages, while Security First had moved to a recurring revenue model, which relies on monthly fees.

3. The S–4 and S–4/A forms state the following risks of the FICS/Edify acquisitions:

S1 will face technical, operational and strategic challenges that may prevent S1 from successfully integrating FICS, Edify and VerticalOne with S1.

The transactions involve risks related to the integration and management of acquired technology, operations and personnel. S1's integration of FICS, Edify and VerticalOne will involve strategic and operational challenges. S1's integration of FICS and Edify will be a complex, time consuming and expensive process and may disrupt S1's business if not completed in a timely and efficient manner. Following the transactions, S1 must operate as a combined organization utilizing common information and communication systems, operating procedures, financial controls and human resources practices. S1 may encounter substantial difficulties, costs and delays involved in integrating the FICS and Edify operations with S1's own, including:
— potential incompatibility of business cultures;
. . . .
— perceived adverse changes in business focus;
— potential conflicts in third-party relationships. . . .
. . . .
We do not expect to achieve profitable operations for the foreseeable future, and this may negatively impact the value of your S1 common stock. . . . Moreover, we expect that the combined company's expenses associated with sales, marketing, research and development, customer support and executive offices will continue to increase over the near term, even though its revenues may not keep pace with these expenses. As a result, we expect to continue to incur net losses for the foreseeable future.
. . . .
The quarterly operating results of S1, FICS and Edify have each fluctuated significantly to date. If the combined company fails to meet the expectations of securities analysts or investors as a result of any future fluctuations in our quarterly operating results, the market price of the S1 common stock would likely decrease. . . .
Form S–4, July 13, 1999; Form S–4/A, October 12, 1999. These risks were also disclosed in later SEC forms as well.

FICS/Edify acquisitions. *See infra* note 10. Two months later, on November 2, 1999, S1 announced that it had received all required regulatory clearances for the FICS/Edify acquisitions and stated that it had a "record" third quarter for 1999 and nine months results. The company reported a 233% increase in revenues from the third quarter of 1999 and a 439% increase in gross margins over the previous quarter. On November 10, 1999, S1 announced shareholder approval of the Edify, FICS and VerticalOne acquisitions and informed the investing public that the deals were scheduled to close within the quarter and again touted the acquisitions as significant gains. *See infra* note 11. S1's stock jumped again, rising from $45 per share to over $57 per share on November 11, 1999. During the months of November and December, Akkermans, Mahan and Stockwell sold shares of their S1 stock totaling more than $63 million.

On February 14, 2000, S1 again reported record 1999 fourth quarter earnings and results and spoke positively of S1's financial condition, stating that the company "took several bold steps to solidify this market and distance ourselves from the competition." The company reported a 318% increase in fourth quarter 1999 revenues from the same period the preceding year. S1 also reported: 1999 calender year revenues of $92 million-up 284% over the prior year's level of $24.2 million; software license revenues of $12.2 million in the fourth quarter-a 435% increase from the same quarter in the prior year; and a 405% improvement in gross margins over the fourth quarter of 1998. The company also confirmed that the acquisitions of Edify, FICS and VerticalOne were completed in November, 1999. In response to the news of S1's successful acquisitions and improved gross margins, the company's common stock soared to $115.125 per share on trading volumes of 1,442,600 shares on February 15, 2000.

In March of 2000, S1 announced the acquisitions of Q UP Systems and Davidge Data Systems and stated that the company had achieved financial "growth milestones." However, on May 2, 2000, S1 reported a net loss of $75.2 million compared to a loss of $3.3 million during the previous year. The company also recorded a greater than expected "earnings before interest, taxes, depreciation and amortization" ("EBITDA") loss of 35 cents a share, compared to the estimate of 23 cents a share. Gross margins also slipped to 36% from 46% in the fourth quarter, due to depressed software sales. In response to the news, S1 shares fell to $42.31 per share on a volume of 10 million shares, approximately ten times S1's average daily trading volume. The price of $42.31 represented a 67% decrease from the stock's high in February 2000. Many of the reasons underlying the greater-than-expected losses centered on higher expenses incurred in absorbing the FICS/Edify acquisitions. S1 also made statements blaming the earnings shortfalls on the acquired companies by noting that the company had problems integrating the differing business models of S1 with that of FICS/Edify. The plaintiffs subsequently filed suit with this court for securities fraud.

The plaintiffs allege that S1's statements regarding its acquisitions and future potential earnings were materially false and misleading and that S1 recklessly disregarded information that the company's acquisitions would not complement S1's product strategy. Specifically, the plaintiffs note that S1 knowingly disregarded that the company would have to change the business model of the Edify acquisition. The plaintiffs also emphasize that the company intentionally ignored that the revenue recognition policies of the acquired companies depended more on license revenues—a different revenue model than the recurring revenue model that S1

used. The plaintiffs allege that the difference in revenue models caused the significantly reduced margins in the first quarter of 2000. Thus, the plaintiffs claim that S1 materially misled investors by continually touting its numerous acquisitions while at the same time knowing that the company was experiencing increased pressure on its margins and incurring additional expenses in integrating the FICS, Edify, and VerticalOne acquisitions.

Several complaints were originally filed with this court by numerous plaintiffs which were later consolidated into the present action.[4] On March 9, 2001, the court granted plaintiff Richard Allegood's motion for appointment as lead plaintiff and approved the appointment of lead counsel. On April 24, 2001, the plaintiffs filed their amended consolidated class action complaint with ·the court bringing claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, naming S1, Mahan, Akkermans and Stockwell as defendants. On April 30, 2001, the plaintiffs issued summons for Akkermans who was living abroad in Belgium. On June 14, 2001, defendants S1, Mahan and Stockwell moved to dismiss the consolidated complaint. Defendant Akkermans moved to dismiss the consolidated complaint on August 8, 2001. The court now considers the motions to dismiss.

### Motions to Dismiss

■ All the defendants have moved to dismiss the consolidated complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 15 U.S.C.

§ 78u–4(b). Defendant Akkermans has also moved to dismiss in a separate motion on the additional grounds of lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2) and insufficiency of process under Fed.R.Civ.P. 12(b)(4). Because "courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims," *Republic of Panama v. BCCI Holdings, S.A.*, 119 F.3d 935, 940 (11th Cir.1997), the court will first consider Akkermans' motion to dismiss under Rules 12(b)(2) and 12(b)(4).

### I. *Akkermans' Motion to Dismiss under Rules 12(b)(2) and 12(b)(4)*

In his motion to dismiss, Akkermans states that the complaint against him should be dismissed under Rule 12(b)(2) and Rule 12(b)(4). The court will first address his arguments under Rule 12(b)(4).

### A. *Sufficiency of Process*

Akkermans contends that service of process was insufficient because it failed to meet the requirements of Fed.R.Civ.P. 4(m) and the Hague Convention. Specifically, Akkermans notes that the plaintiff failed to perfect service on him or even attempt service within 120 days of the commencement of the action[5] as required under Rule 4(m). Further, Akkermans argues that even assuming service was timely, the service was defective because the complaint failed to meet the requirements of the Hague Convention by being printed in French and not in Flemish—the native

---

4. *Hirsch v. S1 Corp.*, 1:00–CV–1158; *McCall v. S1 Corp.*, 1:00–CV–1160; *Nahon v. S1 Corp.*, 1:00–CV–1177; *Block v. S1 Corp.*, 1:00–CV–1191; *Burnstein v. S1 Corp.*, 1:00–CV–1223; *Bauminger v. S1 Corp.*, 1:00–CV–1231; *Zenner v. S1 Corp.*, 1:00–CV–1234; *Felgen v. S1 Corp.*, 1:00–CV–1316; *Weindorf v. S1 Corp.*; 1:00–CV–1467; *Warner v. S1 Corp.*, 1:00–CV–1478; *Smith v. S1 Corp.*, 1:00–CV–1579.

5. Akkermans states that the plaintiffs were required to perfect service on him by no later than October 30, 2000, representing 120 days from the filing of the last of the original complaints. Akkermans also notes that even after the court preliminarily appointed the lead plaintiff on December 1, 2000, the plaintiffs made no effort to serve him within 120 days of that date (March 31, 2001).

language of Akkermans. Therefore, because service was untimely and defective, Akkermans asserts that this case should be dismissed because the one year statute of limitations has passed since the first complaint was filed and any attempt to correct service would now be futile.

The plaintiff responds that service was not untimely because service on a defendant in a foreign country is governed by the Hague Convention and not subject to the 120 day time limit of Rule 4(m). The plaintiff also argues that the complaint did not have to be translated into Flemish because the Belgian Central Authority (mandated by the Hague Convention) did not require a Flemish translation. Moreover, the plaintiff notes that French is one of the official languages of Belgium.

█ The court agrees with the plaintiff that service need not have been perfected or attempted within the 120 day period of Rule 4(m). The last sentence of Rule 4(m) expressly states: "This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1)." Rule 4(f) states that service may be effected on defendants in foreign countries pursuant to the Hague Convention of which Belgium is a signatory country. Courts and commentators have also found that service pursuant to Rule 4(f) is not subject to the 120 day period of Rule 4(m) and the trend of courts is to find that the 120 day period does not apply even if the plaintiff makes no attempt to serve within the period. *See* 4B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1134 (2001 Supp.) ("Because amended Rule 4(f)(1) specifically refers to the Hague Convention as among the permissible means of service in a foreign country, if service is made in accord with the rule, it explicitly falls within the foreign service exception to the 120-day

time limit in amended Rule 4(m) and former Rule 4(j)."); *see also Lucas v. Natoli,* 936 F.2d 432, 433 (9th Cir.1991) ("We find the controlling language of Rule [4(m) ] so clear that it allows no latitude for interpretation"); *Pennsylvania Orthopedic Ass'n v. Mercedes–Benz A.G.,* 160 F.R.D. 58, 61 (E.D.Pa.1995) ("[W]e cannot dismiss the Complaint under Rule 4(m) because that deadline does not apply to foreign service."); *Cargill Ferrous Int'l, a Div. of Cargill, Inc. v. M/V Elikon,* 154 F.R.D. 193, 196 (N.D.Ill.1994) ("So long as service is in accord with Rule 4(f), it is not subject to the 120–day time limit for service. Fed. R.Civ.P. 4(m)."). *But see In re Southold Dev. Corp.,* 148 B.R. 726, 729–30 (E.D.N.Y. 1992) ("[I]t seems illogical to allow a plaintiff who does not even attempt to serve a defendant for more than 120 days after the filing of the complaint to avoid dismissal under Rule [4(m) ] by eventually attempting service in a foreign country pursuant to Rule [4(f) ].").

█ The court also agrees with the plaintiff that service on Akkermans was not defective pursuant to the Hague Convention. The Hague Convention states that each nation shall designate a central authority through which service of process may be effected. *See* Hague Convention, Art. 2. The Central Authority checks the documents for compliance with the Convention, serves them in accordance with its own law (or by a method requested by the sender that complies with the country's law), and returns to the party requesting service a certificate that the documents have been served. *See id.* Arts. 4–6. Under Article 5, the Central Authority "may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed." [6] A country may allow other

6. The full text of Article 5 states the following:
 The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either-

methods of service within its boundaries, *see id.* Arts. 8–11, 19; *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988), or it may object to the use of a particular method of transmission. *See* Hague Convention, Art. 21.

As noted above, Belgium is a party to the Hague Convention. In its agreement to adopt the Hague Convention, Belgium annexed certain declarations modifying the Convention's articles. However, Belgium did not modify the translation rules in Article 5.[7] Further, Article 5 allows for service of a complaint in one of the official languages of Belgium. ' It is undisputed that French is an official language of Belgium. Finally, courts have found that the "return of a completed certificate of service is prima facie evidence that the Authority's service" was made in compliance with that country's law. *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.,* 51 F.3d 1383, 1390 (8th Cir.1995). It is undisputed that the Belgian Central Authority returned a completed certificate of service with Akkermans' notation of acceptance. The court concludes that service was made in compliance with Belgian law and the Hague Convention. Accordingly, Akkermans' motion to dismiss for insufficient process is hereby DENIED.

(a) by a method prescribed by its internal law for the *service of documents in domestic actions upon persons who are within its territory, or*
(b) by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.
Subject to sub-paragraph (b) of the first paragraph of this article, the document may always be served by delivery to an addressee who accepts it voluntarily.
If the document is to be served under the first paragraph above, the Central Authority

### B. *Personal Jurisdiction*

Akkermans also contends that this court lacks personal jurisdiction over him because as a citizen of Belgium, he lacks the requisite minimum contacts with the United States. The plaintiff responds that Akkermans has numerous contacts through his position as Chairman of the Board of an American company and by his trades on an American stock exchange.

When the district court has exercised its discretion, as it does here, not to hold an evidentiary hearing, the standard by which to decide the issue of personal jurisdiction is clear:

[T]he plaintiff must establish a prima facie case of personal jurisdiction over a nonresident defendant. A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict. The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. Finally, where the plaintiff's complaint and the defendant's affidavits [or depositions] conflict, the district court must construe all reasonable inferences in favor of the plaintiff.

*Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990) (citations omitted); *see also Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1988).

may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.
That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document.

7. Belgium does modify Article 5 by requiring that the plaintiff must reimburse costs of an official process server, but makes no reference to translation requirements.

█ It is well established that "[t]he due process clause ... constrains a federal court's power to acquire personal jurisdiction" over a nonresident defendant. *SEC v. Carrillo,* 115 F.3d 1540, 1542 (11th Cir. 1997) (internal quotation marks omitted). The exercise of personal jurisdiction comports with due process when "(1) the nonresident defendant has purposefully established minimum contacts with the forum ... and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 627 (11th Cir.1994); *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1545 (11th Cir.1993).

██ To constitute minimum contacts for purposes of specific jurisdiction,

> the defendant's contacts with the applicable forum must satisfy three criteria. First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum .., thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate being haled into court there.

*Vermeulen,* 985 F.2d at 1546 (citations and quotation marks omitted). "When the personal jurisdiction of a federal court is invoked based upon a federal statute providing for nationwide or worldwide service, the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States." The language of 15 U.S.C. §§ 7v(a) and 78aa authorizes service of process on a defendant in any district "of which the defendant is an inhabitant or wherever the defendant may be found." *See, e.g., Carrillo,* 115 F.3d at 1543 (determining minimum contacts with

the United States under the Securities Exchange Act); *In re Application to Enforce Admin. of Subpoenas of SEC v. Knowles,* 87 F.3d 413, 417 (10th Cir.1996) (same); *Busch v. Buchman, Buchman & O'Brien,* 11 F.3d 1255, 1258 (5th Cir.1994) (same); *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir.1993) (same). Accordingly, Akkermans' minimum contacts must be assessed as with the United States and not merely with Georgia as the forum state.

██ In assessing minimum contacts for specific jurisdiction, even a single purposeful contact may be sufficient to meet the minimum contacts standard when the underlying proceeding is directly related to that contact. *See McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Further, "[a] defendant who is alleged to have knowingly traded on an American exchange on the basis of inside information has purposefully availed himself of the instrumentalities of United States commerce and can reasonably expect to be haled into an American court." *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1068 (9th Cir. 2000); *SEC v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir.1990) (upholding personal jurisdiction over foreign investors alleged to have conducted insider trading in purchasing securities of a United States corporation traded on a United States exchange); *SEC v. Euro Sec. Fund, Coim, SA,* 1999 WL 76801 at *3 (S.D.N.Y.1999). Finally, "employees of a corporation that is subject to the personal jurisdiction of the courts of the forum may themselves be subject to jurisdiction if those employees were primary participants in the activities forming the basis of jurisdiction over the corporation." *Application to Enforce Admin. Subpoenas Duces Tecum of SEC v. Knowles,* 87 F.3d 413, 418 (10th Cir.1996) (citing *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)); *see also Perez–Rubio v. Wyckoff,* 718 F.Supp.

217, 229–31 (S.D.N.Y.1989) (upholding personal jurisdiction over a foreign investment house and its individual officers because the purpose of the corporation was to purchase United States securities on United States exchanges, in part for United States citizens).

Here, it is clear to the court that Akkermans has sufficient minimum contacts with the United States to establish personal jurisdiction over him. Akkermans traded stock on an American stock exchange, served as Chairman of an American company during most of the class period, had numerous communications with S1 representatives in the United States, and participated in some of the alleged misrepresentations through press releases in the United States. Thus, Akkermans clearly had contacts related to the underlying cause of action, had contacts which indicate that he purposefully availed himself of the privileges of conducting activities in the United States and could reasonably anticipate being haled into an American court.

Having found that there are sufficient minimum contacts, the question that remains is whether this is "one of those rare cases in which minimum requirements inherent in the concept of fair play and substantial justice ... defeat the reasonableness of jurisdiction." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 116, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (Brennan, J., concurring) (internal quotation marks omitted). To make this determination, the court must examine "the burden on the defendant, the interests of the forum ..., and the plaintiff's interest in obtaining relief." *Vermeulen*, 985 F.2d at 1551 (citation and quotation marks omitted). Upon consideration of these factors, the court finds that the exercise of jurisdiction in this case over Akkermans is reasonable. Accordingly, Akkermans' motion to dismiss for lack of personal jurisdiction is hereby DENIED.

## II. Motion to Dismiss of S1, Mahan and Stockwell

The defendants [8] have moved to dismiss for failure to state a claim under Rule 12(b)(6) and under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b).[9] The defendants con-

---

**8.** For the purposes of this section, "defendants" refer collectively to S1, Mahan, Stockwell and Akkermans.

**9.** Section 78u–4(b) of the PSLRA states in part:

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant-

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regard-

ing the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

(3) Motion to dismiss; stay of discovery

(A) Dismissal for failure to meet pleading requirements

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

tend that the consolidated complaint is subject to dismissal because (1) the alleged misrepresentations are not actionable misstatements of fact; (2) the alleged misrepresentations are immunized by the PSLRA's safe harbor provisions and the bespeaks caution doctrine; (3) the complaint fails to properly plead scienter; (4) allegations of mismanagement are not actionable under the PSLRA; and (5) the individual defendants cannot be personally liable under the facts alleged. The court first turns to the applicable standards and substantive law.

■ In general, a complaint should be dismissed under Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the plaintiff's claims for relief. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir.1992). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994–95 (11th Cir.1983). Notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir.1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See id.* "Nonetheless, courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial, or where the plaintiff has failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir.1997); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 808–12 (2d Cir.1996) (hereinafter *"San Leandro"*); *In*

*re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1994); *In re Donald Trump Sec. Litig.*, 7 F.3d 357, 371–73 (3d Cir.1993).

■ In considering whether the plaintiffs have pled their case adequately to withstand the motion to dismiss, the court may consider evidence outside the pleadings that is undisputedly authentic and on which the plaintiffs have specifically relied in their consolidated complaint. *See Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997). Additionally, the Eleventh Circuit has ruled that district courts may judicially notice at the motion to dismiss stage any relevant document legally required by and publicly filed with the SEC. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir.1999).

■ The applicable substantive law in this case is section 10(b) of the Securities Exchange Act of 1934, which prohibits any person from using, in connection with the sale of any security, any deceptive device in contravention of such rules and regulations as the SEC may prescribe. 15 U.S.C. § 78j(b). Based on this statute, the SEC has promulgated 17 C.F.R. § 240.10b–5 (hereinafter "Rule 10b–5") to prohibit the making of any untrue statement or omission of material fact that would render statements misleading in connection with the purchase or sale of any security. To state a securities fraud claim under Rule 10b–5, a plaintiff must allege that the defendant (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied; and (6) that proximately caused the plaintiff's injury. *See Bryant*, 187 F.3d at 1281; *Robbins v. Koger Prop., Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997); *Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989); *In re*

*Theragenics Corp. Sec. Litig.,* 105 F.Supp.2d 1342, 1347 (N.D.Ga.2000) (Thrash, J.).

Section 20(a) of the 1934 Act also provides a cause of action against "controlling persons" and persons who aid and abet violations of the 1934 Act or rules such as Rule 10b–5. Any person who "controls" someone who violates the 1934 Act is jointly and severally liable for the violation. 15 U.S.C. § 78t(a). The SEC's implementing regulations define "control" as "the possession, direct or indirect, or the power to direct or cause the direction of the management policies of a person." 17 C.F.R. § 230.405. To survive a motion to dismiss, a plaintiff who asserts "controlling person" claims must allege that the defendant had the power to control both: (1) the general affairs of the primary violator; and (2) the specific corporate policy that resulted in the primary violation. *See Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir.1996). However, the plain-tiffs cannot adequately plead controlling person liability if they do not adequately plead the primary violation. *See id.* at 396–97. The court now turns to the alleged misrepresentations.

### A. *Alleged Misrepresentations*

In the consolidated complaint, the plaintiff presents essentially seven statements wherein the defendants omitted material facts making the statements misleading. These statements include: (1) the May 18, 1999 Business News Article stating that the FICS/Edify acquisitions "could make the company a dominant force in software," Complaint ¶ 28; (2) the accompanying statement of Mahan on May 18, 1999 stating that the mergers would help create "the world's most complete financial portal solutions provider," *id.* ¶ 29; (3) a September 22, 1999 Press Release by Security First touting the FICS/Edify acquisitions and making several successful predictions, *id.* ¶ 32;[10] (4) a November 2, 1999 state-

---

**10.** The September 22, 1999 press release states in part, with emphasis noted in the complaint:

> ATLANTA, September 22, 1999—Security First Technologies Corporation (NASDAQ: SONE), a premier provider of Internet-based applications for the financial services industry, today announced terms of a new agreement to acquire FICS Group, N.V., a privately held company based in Brussels, Belgium.
>
> The terms of the new agreement call for Security First Technologies to issue 10 million shares of its common stock to FICS. The new agreement also enables FICS stockholders to receive up to an additional 4.5 million shares under an "earn-out" if FICS meets certain financial goals through 2002.... Based upon Security First Technologies' closing price of U.S. $35.75 on September 21, 1999, the value of the FICS transaction is approximately U.S. $395 million. If the earn-out targets are reached, the value of the transaction, based upon yesterday's Security First Technologies stock closing price, would be approximately U.S. $566 million.

> "FICS' CEO, Michel Akkermans, has a strong reputation for leadership and, along with his seasoned management team, has established solid relationships with the world's leading financial institutions. It is a privilege to have Michel join Security First Technologies as our Chairman of the Board," said James S. Mahan III, Security First Technologies' CEO. *"Combining forces with FICS remains extremely strategic for us as FICS has an established global presence, blue chip customers, and synergistic corporate banking expertise.* Together, we will continue to execute upon our vision of further establishing the new company as the leading technology provider and innovator in the Internet-based financial services market worldwide." ....
>
> *"I am extremely pleased that we have reached an agreement that will enable FICS to join forces with Security First Technologies and Edify to become the leading provider of Internet-based financial services applications in the world,"* said Michel Akkermans, FICS's founder, CEO and Chairman of the Board. "The new value of the transaction is the result of the changed market price of Security First Technolo-

ment by Stockwell accompanying the 1999 third quarter results stating that EBITDA excluding integration costs were "nearly breakeven and ahead of schedule," *id.* ¶ 36; (5) a November 10, 1999 Press Release announcing the renaming of the company to S1 and projecting future success, *id.* ¶ 39;[11] (6) a February 14, 2000 Press Release wherein Mahan stated that S1 "took several bold steps to solidify this market and distance ourselves from the competition," *id.* ¶ 45; and (7) the press releases dated March 1 and 6, 2000, where S1 announced the acquisition of Q UP Systems and characterized the acquisitions as "complementary" and touted S1's financial "growth milestones," *id.* ¶ 48.

▮▮▮▮ For each of these statements, the plaintiffs allege that the defendants omitted several material facts which made them misleading. These omissions include: (1) S1 and its acquisitions had incompatible business models that would take significant time to integrate, *id.* ¶¶ 33, 41; (2) the acquisitions would not propel growth in gross margins, *id.;* (3) margins and revenues from software licensing would be negatively impacted going forward, *id.* ¶¶ 33, 41, 46, and 57; (4) Edify and FICS were dependent on one-time software li-

gies stocks and a reduction in the number of shares issued to FICS. In addition, FICS employees gain significantly from the new deal in that the number of stock options they will receive is more than doubled. *"We are confident that the new deal places the new S1 Corporation in a stronger position for executing its long-term global strategy.* I am also proud to be named Chairman of the new S1 Corporation, where I will help oversee the most dedicated and experienced technical professionals available to the financial services industry."

**11.** The November 10, 1999 press release states in part:

Security First Technologies (Nasdaq: SONE), the pioneer of Internet banking solutions, today announced the launch of S1 Corporation. The newly named organization will be poised to anticipate and meet the growing demands of its customers in the exploding industry of internet-based financial services. . . .
"S1's vision is to deliver solutions that enable financial institutions to improve their customers' worlds," said James S. Mahan III. "However, we will do more than deliver software and services. We will fundamentally change the way people manage and interact with financial and general-interest information, whether they are an individual or a multi-million dollar corporation. The new S1 is extremely well-positioned to lead the Internet-based financial services industry into the next century."

. . . .
S1 Corporation's Plans for Growth
Building on the momentum gained from its many strategic announcements this year, S1 will continue to pursue acquisitions, partnerships and relationships that facilitate the execution of its vision for the financial services industry and add complementary expertise and capabilities to its solution. In May, S1 announced its intent to acquire Edify Corporation and FICS Group, N.V. *These organizations will bring additional applications and resources that complement S1's product strategy and support the S1 vision.* Also in May of this year, Intuit Corporation invested $50 million in S1 and gave S1 rights to integrate several components of its world-famous tax and small business software. In September, S1 announced its intent to acquire VerticalOne Corporation, which will bring additional services to the S1 solution that further facilitate the execution of the S1 vision.
All S1 activities are focused on executing the company's vision through four primary objectives:
. . . .
● *Outperform the market for maximum shareholder interest and value. Long-term stability in a rapidly changing industry is critical to ensuring confidence from potential customers as well as employees. With its recurring revenue model that has earned the respect of many industry and financial experts, S1 Corporation will continue to maintain its focus on building shareholder interest and value.*

censing revenues, not recurring revenue, *id.* ¶¶ 41, 42, 57; (5) the acquisitions were not "complementary" as described by S1, *id.* ¶¶ 48, 57; and (6) S1 was not entering a period of "long-term stability" as stated by the company, but was engaged in "costly and risky restructuring," *id.* ¶¶ 41, 42, 46, 48.[12] The defendants argue that each of these statements and accompanying omissions fail to state a claim under Rule 10b–5.

### B. *Materiality and Forward–Looking Statements*

The defendants contend that none of the alleged misrepresentations are actionable under Rule 10b–5 because the statements are merely vague instances of puffing on which no reasonable investor would rely. Further, the defendants note that each of the alleged misrepresentations are forward-looking statements and accompanied by appropriate cautionary language. Thus, the alleged misrepresentations could not be considered "material" for the purposes of Rule 10b–5 and the PSLRA.

■■■ A false statement or omission will be considered "material" if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Materiality is a mixed question of law and fact. *See Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). A complaint may not be dismissed pursuant to Rule 12(b)(6) unless the alleged misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* However, "[w]here a reasonable investor could not have been swayed by an alleged misrepresentation, … a court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir.1997).

■■■ "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Grossman*, 120 F.3d at 1119–20 (footnote omitted) (collecting cases); *see also* 15 U.S.C. § 78u–5(c)(1)(A)(ii).[13] Simi-

. . . .

12. The court notes that these theories rely on an alleged failure to disclose material information. While the Exchange Act may promote a policy in favor of disclosure, "[w]hen an allegation of fraud is based on nondisclosure, there can be no fraud absent a *duty to* speak ." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). With respect to Rule 10b–5, the duty to disclose (if any) arises from subsection (b), which requires disclosure of information "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Thus, the question is not simply whether the defendants omitted information potentially of interest to investors. To be actionable, the omission must render the statements *actually made* misleading.

13. Several courts have found that vague puffing and corporate optimism are not actionable under Rule 10b–5 and only specific statements will suffice to survive a motion to dismiss. *See, e.g., San Leandro*, 75 F.3d at 811 (statement that company was "'optimistic' about [its earnings] in 1993" and that it "should deliver income growth consistent with its historically superior performance" held to be mere "puffery" and to "lack the sort of definitive positive projections that might require later correction") (emphasis in original) (internal quotations omitted); *Searls v. Glasser*, 64 F.3d 1061, 1066–67 (7th Cir. 1995) (holding that statements that a company was "recession-resistant" and that it would maintain a "high" level of growth were too vague to constitute material statements of fact); *Hillson Partners Ltd. v. Adage, Inc.*, 42 F.3d 204, 212–14 (4th Cir.1994)

larly, "sales figures, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty." *Helwig v. Vencor*, 251 F.3d 540, 555 (6th Cir.2001) (en banc) (internal quotation marks omitted). However, "'matters that are not material because they are not so probable or relevant as to be required to be disclosed in a particular context may be material if information about them is stated falsely or misleadingly in communications that are not otherwise required to be made.'" *Id.* (quoting Victor Brudney, *A Note on Materiality and Soft Information under the Federal Securities Laws*, 75 VA. L. REV. 723, 750 (1989)).

 "Forward-looking representations are also considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect." *Grossman*, 120 F.3d at 1120. This doctrine, which is called the "bespeaks caution" doctrine, "provides a

mechanism by which a court can rule as a matter of law ... that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Worlds of Wonder*, 35 F.3d at 1413 (citation omitted). However, not every risk disclosure will be sufficient to immunize statements relating to the disclosure; rather, "the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions ... which the plaintiffs challenge." *Trump*, 7 F.3d at 371. General statements that fail to disclose specific underlying material information fail to trigger the protection of the bespeaks caution doctrine. *See Provenz v. Miller*, 102 F.3d 1478, 1494 (9th Cir.1996). Likewise, boilerplate warnings merely reminding an investor that the investment holds risk are not sufficient. *See Trump*, 7 F.3d at 371; *see also Saltzberg v. TM Sterling/Austin Assoc., Ltd.*, 45 F.3d 399, 400 (11th Cir.1995). On the other hand, acceptable cautionary language includes warnings that are specific and are linked

---

(statements in press release that year would "produce excellent results" and that "significant sales gains should be seen as the year progresses" held to be mere general predictions and not material as a matter of law); *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (statements in Annual Report that company expected "10% to 30% growth rate over the next several years" and was "poised to carry the growth and success of 1991 well into the future" held to be immaterial "soft 'puffing'" statements); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir.1990) (finding that the defining question is whether the statement is immaterial, that is whether the statement is so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information); *In re Software Publ'g Sec. Litig.*, 1994 WL 261365 at *4–7 (N.D.Cal.Feb. 2, 1994) (dismissing claims based on statement that company believed it had "the combination of people and products in place to be successful" and was

"now positioned to effectively compete"); *In re Storage Tech. Corp. Sec. Litig.*, 804 F.Supp. 1368, 1372 (D.Colo.1992) (statement of being "proud" of a particular product and opining that it would be a "blowout winner" were mere puffing and could not support a claim because no reasonable person would be misled by them). *But see Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1094–95, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (director's statement in a proxy solicitation that the tender price of the company's stock of $42 a share was "high" and "fair" to minority shareholders was a material statement in that context where stock valuation was subject to objective methods of valuation and the directors' opinions were shown to be false); *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 490 (9th Cir.1974) (prediction that company "expects ... a net income of approximately $1.00 a share" for fiscal year to close in two months held to be a material statement).

to the projections at issue. *See Saltzberg,* 45 F.3d at 400. At bottom, the "bespeaks caution" doctrine stands for the "unremarkable proposition that statements must be analyzed in context" when determining whether or not they are materially misleading. *Rubinstein v. Collins,* 20 F.3d 160, 167 (5th Cir.1994).

■ The PSLRA also provides a statutory safe harbor for certain forward-looking statements in certain circumstances. *See* 15 U.S.C. §§ 77z–2(c), 78u–5(c); [14] *see also Saltzberg,* 45 F.3d at 400. A "forward-looking statement" under the "safe harbor" includes (a) statements containing projections of revenues, income, earnings per share, or other financial items; (b) statements of the plans and objectives of management for future operations; and (c) statements of future economic performance. *See* 15 U.S.C. § 78u–5(i)(1). Similar to the "bespeaks caution" doctrine, the statutory safe harbor insulates a defendant from private securities liability for forward-looking statements if the forward-looking statement is identified as such and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u–5(c)(1)(A)(i). Even if the forward-looking statements are not accompanied by meaningful cautionary statements, defendants are insulated from liability if the plaintiff cannot show that the forward-looking statements were made by or with the approval of an executive officer of the company who had "actual knowledge" that they were false or misleading. *See* 15 U.S.C. § 78u–5(c)(1)(B). However, if a forward-looking statement "is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant." *Harris* 182 F.3d at 803.

In *Grossman,* a case with facts similar to the present case, the plaintiff alleged that various statements issued by the defendants after a public offering were misleading because they failed to disclose the negative financial effect on which two pending mergers would have on the corporation. In connection with the issuance of stock to acquire the companies, the acquiring company had filed a registration statement with the SEC. The registration statement included a warning that the integration of the merging companies could be difficult due to intense competition and declining financial performance, and cautioned that the stock price could fluctuate in the quarters following the merger. The statement further cautioned that the acquisitions could be difficult because they were large acquisitions in new markets where the acquiring company did not have management or marketing experience.

However, the *Grossman* defendants also made several statements during the merger period via news wires and press releases which tended to show that the merger was going smoothly and that the company's market share was increasing. These statements included: (1) the combination

**14.** 15 U.S.C. § 78u–5(c) states in part:

(c) Safe harbor

(1) In general

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial. . . .

of the companies would not dilute future earnings; (2) the acquiring company had experienced success in the integration of sales forces and that the merger process had been moving "faster than we thought it would"; (3) the CEO's comment that "he was pleased with the accelerating pace of product development"; and (4) a company statement noting that it expected "network applications will quickly reshape customer expectations and expand the role of our channel partners in supporting end-user network solutions." Shortly after the last statement, the company announced that its consolidated third quarter earnings would fall between fifteen to twenty percent below estimates previously published by financial analysts, and that the company would recognize a $120 million charge against earnings for the quarter. The next business day, the company's stock price fell by seven percent. The plaintiff shareholder subsequently filed suit alleging securities fraud under Rule 10b–5. The defendants later moved to dismiss under Rules 12(b)(6) and 9(b).

The district court granted the defendants' motion to dismiss because it found in part that the plaintiff had not pled facts showing material misstatements or omissions and because the defendant company had sufficiently disclosed the risks of the merger in its registration statement. On appeal, the Tenth Circuit affirmed the district court. The court noted the statements complained of were all contained in press releases or interview statements and were made in conjunction with a registration statement that contained many explicit risk factors and warnings which the plaintiff had not challenged as inadequate. The court found that the disclosures in the registration statement described the risks involved with the defendant company's proposed mergers and were specifically tailored to address the uncertainty and possible negative outcomes associated with the plans for such mergers. The court

also found that many of the alleged misleading statements were vague statements of corporate optimism. The court stated:

We conclude that the following statements were correctly determined by the district court as a matter of law to be immaterial statements of corporate optimism: 1) [the CEO's] statements that [the company] had experienced "substantial success" in integrating the sales forces of the two companies, that the merger was moving "faster than we thought," and that the merger presented a "compelling set of opportunities" for the company; and 2) [the company's] statements that "[b]y moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge of the expanding scope of network solutions," and that it "expects that network applications will quickly reshape customer expectations ." *These are the sort of soft, puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism.*

We also agree with the district court's conclusion that dismissal of certain portions of the plaintiff's complaint was proper under the "bespeaks caution" doctrine. [The] statement regarding the dilution of "future" earnings is a forward-looking projection, the subject matter of which is covered in great detail in the registration statement. In the registration statement, [the company] clarified its expectation that earnings would fluctuate drastically in the years following the merger, and specifically notes charges that would impact earnings in the third quarter in particular. The district court properly applied "bespeaks caution" to that statement. Likewise, the forward-looking aspects of the statements concerning the "compelling opportunities" available to [the company], the manner in which [the compa-

ny] was moving rapidly toward a "fully integrated sales force" and "leveraging" the "combined knowledge" of the two companies, and the degree to which the company was "quickly reshaping customer expectations" were relatively general, forward-looking projections dealing with subjects that were dealt with in much greater detail in the cautionary sections of the registration statement and amendments thereto.

*Grossman,* 120 F.3d at 1121–22 (emphasis added).[15]

The *Grossman* court also noted that the cautionary statements and risk disclosures need not be included in the same document as the alleged misrepresentations as long as the risk disclosures were related to and proximate in time to the alleged misrepresentations. The court found that particularly in "fraud on the market" cases, "the relevant inquiry concerns the total mix of information available to the market at the time of the allegedly fraudulent statements." *Id.* at 1122. The court thus concluded that the registration statements which contained cautionary language warning of possible problems with the merger were adequate even though the press releases and news wires did not include their own cautionary section. The court stated:

Here, the cautions were contained in formal documents of considerable legal weight-the registration statement and amendments thereto. The allegedly misleading predictions were contained in less formal press releases and interviews which were all closely proximate in time to the registration statement and they all were obviously directly related to the transactions described in great detail in the registration statement. Under the circumstances presented in this case, in a claim of fraud on the marketplace, we believe the cautionary statements contained in the registration statement may fairly be considered as limiting the forward-looking predictions made in subsequent discussions of the same transaction.

*Id.* at 1123.

Similarly, in *Harris,* the defendant company was a manufacturer of pharmaceuticals. Early in the year, the company had issued a press release that, while acknowledging business problems, also showed some optimism. The company's stock subsequently rose. On the last day of the third quarter, the company announced in another press release that it anticipated a $43 million loss. However, the actual losses for the third quarter totaled $179 million, $104 million of which was a reduction

---

**15.** Several courts are in agreement with the *Grossman* court concerning vague alleged misrepresentations in the merger and acquisition context. *See, e.g., In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 891 (W.D.N.C. 2001) (finding that statement "[w]e are very pleased with our progress in integrating recent acquisitions and with the growth prospects stemming from these transactions" is the kind of statement courts have held to be "puffery" and patently immaterial); *Kane v. Madge Networks N.V.,* 2000 WL 33208116 at *3 (N.D.Cal. May 26, 2000) ("Merging companies always predict that they will integrate their sales forces and management teams and that they will achieve 'synergies' from the combination. Reasonable investors know better than to rely on these statements, which are all too familiar to market observers."); *In re Peritus Software Servs., Inc. Sec. Litig.,* 52 F.Supp.2d 211 (D.Mass.1999) (finding that optimistic statements relating to the success of a merger that include language such as "the acquisition ... has been a success," "this confirms our belief that clients can easily leverage the combined product suites," and "[we have] completed the ... acquisition" are non-actionable). *See generally In re Advanta Corp. Securities Litigation,* 180 F.3d 525, 538 (3d Cir.1999) ("General, non-specific statements of optimism or hope even if arguably misleading, do not give rise to a federal securities claim because they are not material.").

in the carrying value of the goodwill ascribed to certain of the company's businesses. Neither of the press releases had mentioned the possibility of the goodwill writedown based on third quarter results. The stock subsequently tumbled and the plaintiff shareholders filed suit under Rule 10b–5. The district court found that all of the alleged misrepresentations in the complaint were forward-looking and accompanied by adequate cautionary language and dismissed the complaint.

On appeal, the Eleventh Circuit affirmed the district court and found that all of the statements were forward-looking and accompanied by meaningful cautionary language. In agreeing with the district court, the Eleventh Circuit found that the accompanying cautionary language was adequate despite the plaintiffs' assertions that the language did not mention the goodwill writedown. The court stated:

> [M]ust the cautionary language explicitly mention the factor that ultimately belies a forward-looking statement?
>
> We think not.... The statute requires the warning only to mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15

U.S.C. § 78u–5(c)(1)(A)(i). [W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.

*Id.*

 In this case, the court finds that all of the alleged misrepresentations fail to state a claim because they are either immaterial or protected by the statutory safe harbor and bespeaks doctrine. First, there is no question that several of the alleged misleading statements can be characterized as mere corporate optimism and vague puffing. Some of the statements cannot even be considered misleading when viewed in conjunction with the alleged material omissions. Specifically, the court finds that paragraphs 28, 29,[16] and 32,[17] of the complaint are too general and vague to be actionable and are immaterial as a matter of law. The court also finds that the remainder of the alleged misrepresentations, including: the statement in paragraph 36 of the complaint that integration costs were "ahead of schedule," the

**16.** These allegations include: (1) the May 18, 1999 article referring to the FICS/Edify acquisitions as a "deal that could make the company a dominant force in software"; and (2) Mahan's statement that the company is "creating the world's most complete financial portal solutions provider that is well positioned to take advantage of the explosive growth of the online financial services market." It is also noteworthy that these statements were made before the class period began on September 22, 1999 and that the first statement was not made by an S1 representative.

**17.** Although the plaintiffs contend that the statements in the September 22, 1999 press release, including: "[c]ombining forces with FICS remains extremely strategic for us as FICS has an established global presence, blue chip customers, and synergistic corporate banking expertise," the assertion that the merger "will enable FICS to join forces with Security First Technologies and Edify to become the leading provider of Internet-based financial services applications in the world," and the claim that "[w]e are confident that the new deal places the new S1 Corporation in a stronger position for executing its long-term global strategy," *see supra* note 10, are misrepresentations because the acquisitions did not turn out to be "synergistic," the court concludes that these statements are too vague and general to be actionable. In addition, the court notes that the reference to "synergies" between FICS/Edify and S1 in the press release *do not* refer to synergies of business revenue models but to "banking expertise." Hence, the alleged omissions do not even render the statement *actually made* misleading.

November 10,1999 press release in paragraph 39 of the complaint,[18] the statement in paragraph 45 of the complaint which states that S1 "took several bold steps to solidify this market and distance ourselves from the competition with the acquisitions of Edify, FICS and VerticalOne," and the allegations in paragraph 48 that the acquisitions were "complementary" and that S1 had achieved financial "growth milestones," also constitute vague puffing and immaterial corporate optimism.[19] Therefore, the court finds that all of the alleged misrepresentations (paragraphs 28, 29, 32, 36, 39, 45 and 48 of the complaint) are immaterial as a matter of law.

██ Second, the court also finds that almost all of the alleged misrepresentations fall within the statutory safe harbor and/or the bespeaks doctrine. Specifically, the statements set forth in paragraphs 28, 29, 32, 36, 39 and 45 of the complaint can all be considered general forward-looking statements which predict future business success and economic performance under 15 U.S.C. § 78u–5(i)(1). Other words ap-

pearing in the alleged misrepresentations such as "to *become* the leading provider," "*will bring* additional applications," and so forth indicate that the statements are forward-looking. The statements in paragraphs 36 of the complaint and the "recurring revenue" statement in paragraph 39 of the complaint do not appear at first glance to be forward-looking statements because they are in the present tense. However, when put into context with the statements as a whole, it is clear that the statements are "about the state of a company whose truth or falsity is discernible only after it is made[, which] necessarily refers only to future performance." *Harris*, 182 F.3d at 805. For example, the phrase regarding S1's "recurring revenue" in the November 10, 1999 press release is clearly forward-looking when analyzed with the preceding introductory sentence: "All S1 activities are focused on executing the company's *vision* through four primary *objectives* . . . ." and the succeeding phrase "continue to maintain its focus on building shareholder interest and value." *See su-*

**18.** The court finds that the highlighted portion of the November 10, 1999 press release stating that the FICS/Edify acquisitions "will bring additional applications and resources that complement S1's product strategy," "[l]ongterm stability in a rapidly changing industry is critical to ensuring confidence from potential customers as well as employees," and "[w]ith its recurring revenue model . . . S1 Corporation will continue to maintain its focus on building shareholder interest and value," *see supra* note 11, is immaterial vague puffing. Moreover, the court again notes that these statements do not match the alleged omissions. First, there is no allegation that FICS/Edify did not have complementary "applications and resources," but only that they had differing business models. Second, the "longterm stability" statement is simply a general phrase which S1 notes is important in the business world, not that S1 is entering an era of "longstability." Finally, the phrase regarding "recurring revenue" model is also not misleading when compared with the alleged omissions. The plaintiffs do not allege

that S1 did not have a recurring revenue business model, nor that S1 did not plan to continue a recurring revenue model after the FICS/Edify acquisitions. The plaintiffs only allege that FICS and Edify did not have recurring revenue models when acquired and that this complicated the mergers and contributed to greater-than-expected losses.

**19.** The plaintiffs cite *Gross v. Medaphis Corp.*, 977 F.Supp. 1463 (N.D.Ga.1997) (Hull, J.) and *Premiere Technologies, Inc.*, 2000 WL 33231639 (N.D.Ga.2000) (Forrester, J.) for the proposition that repeatedly boasting that certain acquisitions would provide a company with future financial gains and a competitive advantage while failing to disclose that the acquisition had severe operational problems is actionable and not vague puffing. However, these cases are distinguishable because neither case considered the question of materiality and the alleged misrepresentations in those cases were more specific than the alleged general statements in this case.

*pra* note 11. Accordingly, the court finds that the statements set forth in paragraphs 28, 29, 32, 36, 39 and 45 of the complaint are forward-looking statements.

■ The court also finds that the statements were accompanied by meaningful and adequate cautionary language. The SEC forms submitted for the FICS/Edify acquisitions and subsequent filings provided adequate and detailed cautionary language which warned of potential problems with the acquisitions and the high possibility of meager or nonexistent profitability in the foreseeable future. *See supra* notes 2 and 3. Most of the press releases and public statements also included a cautionary statement which referred the reader to the company's SEC registration statements. Further, as noted in *Grossman*, the cautionary language for mergers need not be included with press releases because a "registration statement may fairly be considered as limiting the forward-looking predictions made in subsequent discussions of the same transaction." *Grossman*, 120 F.3d at 1123. Although the plaintiffs contest that these warnings were not adequate because they did not particularly note the problem of incompatible business models, the court finds that the cautionary statements "warned of risks of a significance similar to that actually realized," *Harris*, 182 F.3d at 806, "in formal documents of considerable legal weight." *Grossman*, 120 F.3d at 1123. Thus, even assuming that these statements could be considered material by a reasonable investor, most of the statements are still protected as forward-looking statements under the statutory safe harbor and the bespeaks doctrine. Therefore, the court concludes that statements noted in paragraphs 28, 29, 32, 36, 39 and 45 of the complaint are protected under the safe harbor and the bespeaks doctrine. Because the court has found that all of the alleged misrepresentations fail to state a claim because they are either not material

or are protected as forward-looking statements, the court need not reach the defendants' arguments concerning scienter. Accordingly, S1's motion to dismiss the complaint is hereby GRANTED.

### D. *Individual Liability of Akkermans, Mahan and Stockwell*

Because the court has found that none of the alleged misrepresentations state a claim for relief, the motion to dismiss for the individual defendants Akkermrans, Mahan and Stockwell is also hereby GRANTED.

### E. *Leave to Amend*

■ In the Eleventh Circuit, there is a presumption that leave to amend should be granted at least once after the dismissal of a complaint when a more adequately pled complaint might state a cause of action. *See, e.g., Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir.1991); *In re Theragenics*, 105 F.Supp.2d at 1362. Therefore, the plaintiffs are granted permission to file leave to amend their complaint within twenty (20) days from the docketing of this order. However, if the court finds that the plaintiffs have failed to add allegations which fail to meet the standards set forth in this order or reallege statements already dismissed by this court, the court will deny the motion for leave to file an amended complaint and dismiss this case with prejudice.

### *Summary*

The plaintiffs' motions to exceed page limitations [Doc. Nos. 44–1, 54–1] are hereby GRANTED. The plaintiffs' motion for leave to file a sur-reply brief in opposition to defendant Michel Akkermans' reply in support of his motion to dismiss the consolidated complaint [Doc. No. 59–1] is hereby GRANTED. The motions to exceed page limitations filed by defendants

S1 Corporation, James S. Mahan III, and Robert F. Stockwell [Doc. Nos. 42–1, 52–1] are hereby GRANTED. The motion to dismiss the consolidated complaint filed by defendants S1 Corporation, James S. Mahan III, and Robert F. Stockwell [Doc. No. 43–1] is hereby GRANTED. The motions to exceed page limitations filed by defendant Michel Akkermans [Doc. Nos. 47–1, 57–1] are hereby GRANTED. The motion to dismiss the consolidated complaint filed by defendant Michel Akkermans [Doc. No. 48–1] is hereby GRANTED. The plaintiffs are granted permission to file leave to amend their complaint within twenty (20) days from the docketing of this order.